THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* CÁNDIDO SANTOS MARTÍNEZ, Defendant and Appellant.

No. 14312.    Argued April 13, 1950.—Decided April 27, 1950.

*Luis A. Archilla Laugier* and *José E. Bosch Roqué* for appellant.
*Vicente Géigel Polanco, Attorney General, J. Rivera Barreras,
Fiscal of the Supreme Court,* and *Fernando Fornaris, Jr.,
Assistant Fiscal,* for appellee.

MR. JUSTICE MARRERO delivered the opinion of the Court.

Cándido Santos Martínez was prosecuted and convicted of a violation of § 4 of Act No. 220 of May 15, 1948 (p. 738) known as the *Bolita* Act. From the judgment rendered against him, he has appealed and assigns four errors.

In the first assignment he alleges that his conviction is void because the above-mentioned Section of Act No. 220 is unconstitutional and has no legal force: "because it violates the due process clause contained in the Fourteenth Amendment to the Federal Constitution and § 2 of the Organic Act of Puerto Rico; because said section does not contain an ascertainable standard of guilt; because the phrase 'which may be utilized or used' in the statute is fatally vague and indefinite." The questions raised by this assignment have been already decided adversely to the contention of the appellant, and therefore it is unnecessary to stop to discuss them. *People v. Mantilla, ante,* p. 35.

Sometime before the trial the defendant filed a motion praying that his arrest be declared illegal, as well as the suppression and return of the evidence seized. Said motion was heard shortly before the trial and upon being denied, the case was heard on its merits. The oral evidence introduced

by the defendant in support of his motion was to the effect that he was in a small café of Isidoro Quiñones watching other persons who were playing dominoes and pool and that when the policemen arrived, one of them told him that he was under arrest; that he objected, but that they threw themselves upon him, searching him and taking from him the money, and that at that time he was not committing any crime, since he had been there from the afternoon. The evidence for the prosecution tended to show that on May 21, 1949, four policemen were travelling in an automobile along Del Carmen Street, Santurce, and upon approaching a poolroom, located in the corner of La Monserrate Street, one of them saw that the defendant, while he was standing in one of the doorways of the establishment, was writing numbers in an orange notebook; that a person next to the defendant was giving him money and that the former put it in a bag; that policeman Padilla, who had already asked the chauffeur to stop the vehicle, alighted therefrom and followed the defendant, who, upon becoming aware of the presence of the policemen, went inside the establishment, handing a package to Ismael Pagán, and that Pagán immediately placed that package in the transom of an inner door; that the package was examined by the police and it contained materials used in the *Bolita* game; that then the police arrested and searched the defendant seizing some money from him "in small change and a pencil". For a better understanding of what happened we shall forthwith refer to the pertinent part of the testimony of policemen Antonio Díaz and José M. Padilla. The former, upon being examined by the Prosecuting Attorney, testified:

"That evening, at about 8:30 to 9:00, on May 21, Sergeant Diego Ortiz, detective José M. Padilla, Pacheco and myself, were travelling in an automobile along Del Carmen Street towards Monserrate Street. When we approached a poolroom located on the corner, Padilla, who was sitting besides me in the back seat, said to Pacheco: 'Stop, look a *bolita* operator there'. Immediately he opened the door, alighted from the car and I alighted also,

and then I saw the defendant with an orange notebook in his hands, and at the same time he was putting a paper bag inside his left pocket. He entered in the poolroom. Padilla followed him and I went around another door. When I reached the kitchen door he met a young man who is the fellow who testified here, and gave him the notebook and a piece of paper that he took out of his pocket. The young fellow placed them in the transom of the door. When I went to arrest him he offered resistance and broke loose. It was when he ran out into the street and entered the poolroom, that sergeant Ortiz and the others took him out from there and put him inside the automobile. That was all. We seized the paper bag which contained $67.65 in dollar bills, some change and a pencil. Later Padilla came with the young fellow and the notebook he had left. We arrested both of them although the boy stated 'that is not mine'.

". . . . . . . .

"A. That is not mine, that belongs to this man who gave it to me. That will be decided by the Court and we arrested both of them. . . . . ."

The latter testified, that on May 21 he was an Insular Police detective; that on that day he saw the defendant "writing *bolita* numbers in an orange notebook . . . on the wall of the small café located in Monserrate Street corner del Carmen at Stop 16, Santurce.

"Dist. Atty.: Q. Did you see him and what happened?

A. When I saw him I was going to alight from the car but when he saw us he entered the small café and took out from his pocket a list of paper and gave it to a fellow named Ismael Pagán, who was standing at the kitchen's doorway. The boy took the notebook and the list of paper.

". . . . . . . . . . . . . . . . . . . . .

"A. I saw him. The boy took the notebook and the lists of paper and placed them on the kitchen's doorway.

". . . . . . . . . . . . . . . . . . . . .

"A. Sergeant Diego Ortiz made him a receipt, he refused to take it and alleged that the money which had been seized from him was not for *bolita* purposes. That only the change was for the *bolita* game.

"Q. How did he allege that?

"A. I do not remember the exact words. He said that he was not going to sign the receipt because all that money was not for *bolita* purposes but only the change.

" ... ... ... ... ... ... ... ...

"Q. At what distance was the defendant from you when you were inside the car?

"A. At about six feet.

"Q. This defendant was on the street?

"A. He was on the sidewalk.

"Q. Of where?

"A. On the sidewalk of the small café.

" .

"Q. Could you see that it was orange at nighttime?

"A. There was a light.

"Q. A big light?

" .

Upon being examined by Attorney Archilla Laugier the witness testified:

"Q. At nighttime and from that distance you state that you saw those numbers?

"A. Yes, Sir.  A very short distance.

" .

"Q. Was there another person with him at that time?

"A. Yes, Sir.

"Q. Who?

"A.  A man standing besides him.

"Q. What was his name?

"A. I do not know, I know that he called him, that he gave him money and that he took out the paper bag and put the money inside."

With this evidence the court denied defendant's motion.

In this case no search was made before the arrest.  On the contrary, the lower court reached the conclusion that in accordance with the evidence believed by it, the defendant committed a crime in the presence of the police and that subsequent to its commission and to the ensuing arrest, the detectives searched the defendant.  If the policemen saw that the defendant delivered a package to another person, that the latter immediately placed it on the transom of a door and

that the package, when seized appeared to contain *bolita* material, there is no doubt that the defendant committed a crime in the presence of the police and consequently could be searched without a search warrant. See *People* v. *Colón*, decided by Per Curiam Decision of March, 1950.

In harmony with § 116 of the Code of Criminal Procedure "A peace officer may make an arrest . . . for a public offense committed, . . . in his presence." When legally arrested a defendant may be validly searched by the police. *United States* v. *Weeks*, 232 U. S. 383, 392 and *United States* v. *Rabinowitz*, 339 U. S. 56. Consequently the second error was not committed either.

■■ The defendant also contends that the court erred "in refusing to admit in evidence a paper on which the District Attorney made the defendant write his name and the date on which the trial was being held for the purpose of ascertaining the identity of his writing with the writing in the lists introduced in evidence." During the course of the trial and while the defendant testified, the District Attorney requested the latter to write his name on a piece of paper he gave him, as well as the date. The defendant stated that he did not know the day in which he was living and after he was told that it was June 30 "apparently" he agreed to what the District Attorney requested from him.[1] Then the following occurred:

"Attorney Bosch: A test was given to the defendant. We wish to know the result.

"The Court: That was something the District Attorney thought of. *If you wish to introduce it the Court will decide.*

"Attorney Archilla Laugier: On cross-examination the District Attorney required the witness to write. He did it for some purpose. Witness cannot be required to make something for no purpose.

---

[1] We say "apparently" because it was not shown whether or not the defendant wrote the information requested from him, although it may be assumed that he did so.

"The Court: *There is nothing before the Court.*

"Attorney Archilla Laugier: We are going to introduce in evidence the numbers written by the defendant in Court.

District Attorney: We object.

"The Court: Sustained. *It is no time for the introduction of evidence. The examination only carries to the knowledge of the Court that the defendant knows how to write.*

"Attorney Archilla Laugier: We object. It is our turn to introduce evidence.

"The Court: *You may introduce it at the proper time.*

"Attorney Archilla Laugier: We think that this is the proper time to introduce evidence of the words and numbers written by the defendant.

"Attorney Bosch: It is done to show that the District Attorney has made a test of numbers and letters and it appears that the numbers written by the defendant on that evening are different from his handwriting, different to the test in the record.

"The Court: If the evidence is introduced at the proper time, the Court will decide.

"Attorney Archilla Laugier: Exception. This is the proper time because we are introducing our evidence." (Italics ours).

The court did not commit this error either. At the time when defendant was required to write his name and the date on which the trial was being held, the District Attorney was cross-examining the witness. It was not the proper time for the defense to introduce evidence. At that time the defense could identify the document if it intended to introduced it in evidence. It did not do so in spite of the fact that the court stated that it could be introduced at the proper time. If defendant actually meant to insist on the admission of the document, he should have introduced it at the close of the cross-examination by the District Attorney. If rejected by the court, the defendant should have insisted that the document remain in record as evidence offered and not admitted by the court. *Cf. People v. Ayala*, 38 P.R.R. 378. Under those circumstances the error was not committed.

■ In the fourth and last error assigned the defendant contends that the court erred in finding him guilty of the crime without sufficient evidence against him. The careful

examination which we have made of the transcript of the evidence convinces us that there is sufficient evidence to justify the conclusion reached by the lower court.

The judgment appealed from will be affirmed.

MR. JUSTICE TODD, JR., dissenting.

I dissent. First, because of the constitutional question involved (see my dissenting opinion in *People* v. *Mantilla, ante,* p. 35) and second, because I consider that the lower court committed manifest error in weighing the evidence.